[Cite as *In re D.A.*, 2024-Ohio-1416.]

IN THE COURT OF APPEALS OF OHIO
FOURTH APPELLATE DISTRICT
ATHENS COUNTY

| | | | |
|---|---|---|---|
| In Re: J.C. | : | Case No. | 23CA25 |
| B.A. | | | |
| A.C. | : | DECISION AND | |
| C.C. | | JUDGMENT ENTRY | |
| D.A. | : | | |
| | | | |
| Adjudicated Dependent | : | **RELEASED 4/10/2024** | |
| Children | | | |

_____
APPEARANCES:

Christopher Bazeley, Cincinnati, Ohio, for appellant.

Keller J. Blackburn, Athens County Prosecuting Attorney and Timothy L. Warren, Assistant Athens County Prosecutor, Athens, Ohio, for appellee.
_____
Hess, J.

{¶1} The underlying juvenile case involved five children and four parents, two mothers and two fathers. This appeal involves only the mother of J.C., A.C., C.C., and D.A. and her four children. Mother appeals the judgment of the Athens County Court of Common Pleas, Juvenile Division, granting permanent custody of these four children to the Athens County Children Services (the "Agency"). The mother assigns one error asserting that the permanent custody award was against the manifest weight of the evidence. For the reasons which follow, we overrule her assignment of error and affirm the juvenile court's judgment.

I. FACTS AND PROCEDURAL HISTORY

{¶2} Because mother, Samantha, and her four children are the subjects of this appeal, factual and procedural matters related to the fathers, the other child, B.A., and

B.A.'s mother, Rita, will be discussed only when relevant to the appeal. Thomas is the father of three of Samantha's children (J.C., A.C., and C.C.) and Brandon is allegedly the father of one (D.A.). Brandon is also the father of Rita's child, B.A.. At the time the complaint was filed, Samantha and Brandon were living together with all five children.

{¶3}   On November 12, 2021, the Agency filed a complaint alleging that the children, ranging from ten years old to four years old, were neglected and dependent. The complaint alleged that Brandon and Samantha lived together with all five children. B.A. had been placed in the care of his father Brandon because B.A. and his two other siblings (Rita's other two children who were not part of this case) were the subject of another juvenile case in which Rita was found to have substance abuse issues. Samantha and Brandon were alleged to have a history with the Agency since 2013, due to lack of supervision, educational and medical neglect, unsanitary conditions of the home, and substance use issues which affected their ability to care for the children. Thomas (father of J.C., A.C., and C.C.) was incarcerated at the time the complaint was filed and had pending charges in five criminal cases, including drug offenses, and was allegedly uninvolved with his children. Brandon had not established paternity of D.A., the child he allegedly fathered with Samantha. The Agency alleged that Brandon and Samantha failed to ensure the children attended school regularly. The children were alleged to have behavioral issues that escalated into multiple episodes of physical aggression with their peers and school staff. The Agency alleged that Brandon and Samantha tested positive for marijuana, cocaine, and oxycodone on October 27, 2021, approximately two weeks before the complaint was filed. The Agency also filed a motion for temporary custody of

the children. A hearing on the complaint was set for an adjudicatory hearing December 14, 2021.

{¶4}   On December 2, 2021, the Agency sought an emergency ex parte order for custody of the children. The magistrate conducted a hearing on the emergency motion on December 3, 2021 and the juvenile court adopted the magistrate's decision and granted emergency custody to the Agency. The Agency submitted an affidavit in support of emergency custody stating that on December 1, several of the children came to school with bruises and head and facial injuries inflicted upon them by Brandon. Brandon also choked the children "to the point that their feet don't touch the floor." Brandon and Samantha tested positive for oxycodone, cocaine, benzodiazepines, and marijuana on November 19, 2021. The children also reported that Brandon and Samantha told them that they are taking them "on vacation soon."

{¶5}   The juvenile court held an adjudicatory hearing on January 25, 2022. Rita and Thomas did not attend. Samantha and Brandon attended and stipulated to an adjudication of dependency. The Agency dismissed the allegations of neglect. The trial court found that the children were dependent and granted temporary custody of them to the Agency. Reunification was the plan objective, and the juvenile court incorporated the case plan and all amendments filed previously in the matter. The court set the matter for a review hearing and a hearing on the placement of one or more of the children in a qualified residential treatment program ("QRTP") for March 15, 2022.  Several of the children were placed in a QRTP following the March 2022 hearing. Additional review hearings were conducted throughout 2022 and the children were ordered to remain in the temporary custody of the Agency.

{¶6} On December 20, 2022, the Agency sought permanent custody of the children and an order terminating all parenting rights of Samantha, Brandon, Rita, and Thomas. The Agency contended that the children had been in the Agency's temporary custody for 12 or more months of a consecutive 22-month period and it was in the best interest of the children to be placed in the permanent custody of the Agency. The Agency alleged that Samantha failed to comply with the case plan, tested positive for marijuana and oxycodone within the past four weeks, engaged in mental health services inconsistently and without benefit, and failed to benefit from parenting education. Brandon was alleged to have repeatedly tested positive for cocaine and oxycodone, failed to benefit from mental health services, and failed to benefit from parenting education. Rita was alleged to have two other children in the temporary custody of the Agency and to have failed to visit or communicate with B.A. in over 90 days. Thomas allegedly failed to communicate or visit with his children (J.C., A.C., and C.C.) since before their temporary placement with the Agency.

{¶7} The permanent custody hearing was held over the course of several dates in March, May, and August 2023. However, in June 2023, new allegations of sexual abuse by Brandon against C.C. arose and the Agency requested an amendment to the case plan to suspend all visitation between Brandon and Samantha and all their children. Samantha and Brandon objected to the visitation suspension on the ground that it would be unfair to suspend both parents' visitations with all children when the abuse allegation involved only one of the parents and one of the children. The juvenile court held a hearing on the objection to the visitation suspension in June 2023. The Agency argued that it believed suspension of visitation by both parents with all children was necessary during

the investigation because both parents had a history of discouraging their children to be forthcoming with statements to investigators. The Agency was concerned that the parents would coach or prep all of the children's testimony to investigators and would tell the children that they would be "in trouble for telling." The trial court adopted the Agency's modified visitation and found that both parents' visitation would be suspended pending the investigation, but also encouraged the Agency to get the investigative interviews done quickly. "I'm urging the agency and telling the agency more than just urging that they need to have them [the interviews] ASAP because if visitations are appropriate they need to resume ASAP * * *." The investigation concluded and it was determined that the abuse allegation was unsubstantiated and there was no basis for pursuing criminal charges.

{¶8} On the first day of the permanent custody hearing in March 2023, the Agency presented Bridget Lemberg, a lab director and toxicologist at Forensic Fluids Laboratories, who testified that she analyzed Samantha's drug screens over a 3-year period and 21 of the screens were positive for marijuana, oxycodone, and hydrocodone. Only one of Samantha's drug screens was negative, which occurred in May 2020. Her most recent screening was on March 6, 2023, about three weeks before the hearing, and was positive for marijuana and oxycodone. Morgan Yoho testified that she was employed with the Agency and supervises visitation and administers drug screens. Yoho testified that she collected a drug screen from Samantha on June 7, 2022, which tested positive for opiates, hydrocodone, and oxycodone and that Samantha did not have a prescription for those medications.

{¶9} On the second day of the hearing in May 2023, Chelsie McDaniel testified that she was employed by the Agency as a family support worker and visitation

supervisor. McDaniel testified that she supervised six visitations with the family. Samantha and Brandon's visitation schedule with the children was Tuesdays from 4 to 6 p.m. and Thursdays from 5 to 7 p.m. McDaniel recalled that B.A., D.A., and J.C. were present for visitation, either in person or virtually, but she does not believe she ever supervised a visitation involving A.C. or C.C. McDaniel testified the visitations she has supervised between Samantha and the children "go pretty well." "Samantha and Brandon both go play basketball with them, and they throw the football. I feel like they go pretty well." McDaniel testified that she collected a drug screen from Samantha on September 6, 2022, which tested positive for marijuana and Samantha did not have any prescription medications at the time.

{¶10} Glen Driggs testified that he was employed by the Agency as a case aid and his duties included collecting drug screens. Driggs collected drug screens from Samantha on March 6, 2023, which was positive for marijuana and oxycodone, on January 17, 2023, which was positive for marijuana, hydrocodone, and oxycodone, on December 20, 2022, which was positive for marijuana and oxycodone, on November 15, 2022, which was positive for marijuana and oxycodone, and on October 31, 2022, which was positive for marijuana. Samantha's only prescription medication was Lexapro during November and December 2022.

{¶11} Lainey Bartolovich testified that she is an employee at Fox Run, a residential mental health center facility for children and adolescents. Bartolovich was the case manager for C.C. and had access to her records. C.C. had already been placed at Fox Run when Bartolovich started working with her in October 2022 on trauma, abuse, neglect, and anger management. C.C. has never mentioned any abuse by her mother,

Samantha, but has mentioned physical abuse from Brandon.  C.C. has stated that she is concerned about her mother being hurt by Brandon and that C.C. does not want to be in a home with Brandon. C.C. has been doing well while at Fox Run and has improved since she first arrived there.  Samantha has visited one or two times since Bartolovich has been working with C.C., but the issue has been with transportation to Fox Run. Additionally, Samantha and C.C. participate in telephone and Zoom calls, which have been fairly consistent.

{¶12}  Hannah Fisher testified that she was employed by the Agency as a family support worker, which includes collecting drug screens. Fisher collected drug screens from Samantha on March 2, 2023, which tested positive for marijuana, and on October 18, 2022, which tested positive for marijuana. The only prescription medication Samantha had during this time was for Lexapro. Fisher is also involved in supervising visits that Samantha and Brandon had with B.A., D.A., and A.C., when A.C. had transportation. J.C participated virtually in the visitation.  Fisher testified that the visits have been monitored visitation. The visits are monitored by camera and audio that can be viewed and listened to via a computer in another room. The family has not had "off ground" visitation but Fisher testified she would "have no safety concerns if off ground visits were to be implemented." Occasionally the parents may have raised their voices or used "cuss words" but they are "always very compliant" when redirected. Fisher testified that she believes the quality of the visitations have improved over time.

{¶13}  On the third and fourth days of the hearing in August 2023, Angel Murray testified that she was employed with the Agency as a family services caseworker and was assigned to the children involved in this case.  Murray testified that the children had been

in the Agency's custody since December 2021 and that there were extensive historical reports of physical abuse of the children by Brandon.  Brandon denies the allegations of abuse and Samantha "indicated that she didn't feel like [Brandon] posed a threat to her children." The case plan objectives for Samantha were to protect and provide for the children, implement positive parenting skills, demonstrate financial support for the needs of the children, and engage in mental health and substance use services.  Samantha had mental health on her case plan because she "has a history of some mental health concerns that can impair functioning." Substance use services were part of the plan because positive drug screens "was part of what lead to the removal of the children from the home, and there's been a history of substance use through the life of the case." Murray testified that Samantha engaged in the mental health and substance use services, but there has not been sufficient progress for reunification of the children to occur.

{¶14}  Murray testified that Samantha does not take responsibility for the situations that led to the children being in the Agency's care. Murray also testified that there was a history of people who use drugs coming in and out of the home and Samantha did not identify these people as being of concern to the safety and wellbeing of the children. Samantha also signed a release of information form that did not allow for the release of drug screens and she failed to seek out a primary care physician for certain physical concerns. Samantha also acknowledged to Murray that Brandon may have over disciplined, but she did not believe he posed a threat to the children. The four oldest children had disclosed physical abuse and the youngest child expressed concern about his mother, Samantha, not being safe at home without the children there. Since about early June 2023, Brandon had moved out of the home he shared with Samantha and they

were separated because of the children's complaints about Brandon. Murray testified that the female children want to return home to Samantha if Brandon is not there. And the two male children of Samantha want to return home to her. Murray testified that the female children told her that they are "terrified" of Brandon and "described being tortured. Those are their words. Because of the physical abuse they feel like he is mean."

{¶15}  Murray also testified that the children have a history of physical abuse and "being at school dirty. Having chronic head lice. Being around town unsupervised." There was also concern about sexual abuse and sexual contact between the various siblings. Murray also testified that she collected drug screens from Samantha on February 6, 2023, which was positive for marijuana, on August 15, 2022, which was positive for marijuana, on June 13, 2022, which was positive for marijuana and oxycodone, on March 30, 2022, which was positive for marijuana, oxycodone, and hydrocodone, and on February 16, 2022, which was positive for marijuana and oxycodone. Murray testified that Samantha did not have a medical prescription for any drugs at the time of the screenings she performed.  Murray testified that the positive drug screenings were concerning because Samantha denied that she was continuing to use any of the drugs for which she tested positive. Murray was concerned about the continual and consistency of drug use by Samantha because drug use impairs decision making and the ability to keep the children safe and make good decisions for them.

{¶16} Murray testified that one of the boys and both girls were in qualified residential treatment programs after unsuccessful stays in foster care homes. Murray testified that the Agency sought permanent custody of the children because despite the efforts, the parents have not benefited from the substance abuse and mental health

services to be able to safely care for the children or provide for their extensive mental health needs. The parents pose a threat to the children by not addressing their problems and as a result they are not able to parent the children who "have very high vulnerability, high needs." Murray testified that "the needs of the children are extensive there [sic] PTSD and a lot of their trauma and their mental health needs are based on early, um, childhood abuse and neglect, and dependency issues, and that, um those are things that they are going to continue to struggle with * * *." Murray testified that the children have expressed a desire to live with their mother, Samantha, and that Samantha has full-time employment and safe and appropriate housing for the children.

{¶17} Katie Fox testified that she is employed as a program coordinator and mental health therapist at Integrated Services for Behavioral Health and has been Samantha's therapist since October 2022. Fox testified that she is working with Samantha to increase her self-esteem and address symptoms of anxiety. Fox believes that Samantha is benefitting from counseling and has accomplished her goal of gaining employment and is motivated to work on her case plan for reunification. Fox testified that she does not provide drug counseling services to Samantha and did not know what drugs Samantha has abused. Fox also testified that Samantha has never expressed concerns that her children had been physically or sexually abused and they have not discussed how Samantha plans to arrange care for her children if she must be at work.

{¶18} Lee Ann Brooks testified that she was a licensed chemical dependency counselor at Integrated Services for Behavioral Health. She has been providing drug counseling services to Samantha for less than a year and has seen her "sporadically." She had not seen Samantha since March 2023. They did drug screens of Samantha and

the substances found were benzodiazepine and Vicodin but Brooks could not testify about the screens more specifically without having the reports to review. Brooks testified that Samantha explained the positive drug screens were because she was overwhelmed with not having the children in the house and the anxiety she was previously suffering.

{¶19} Kayla Garcia testified that she was a community behavior health worker at Integrated Services for Behavioral Health and has worked with Samantha for about a year. Garcia testified that Samantha was able to obtain many things on her own, such as employment and her driver's license. Garcia testified that she does not provide mental health or substance abuse counseling. Karyn Armstrong testified that she works with the Agency as a parent/mentor and has provided mentoring services to Samantha from March 2022 to January 2023, meeting about 10 times over the course of those months. Armstrong testified that Samantha was "kinda feeling a little overwhelmed with the children and their difficult behaviors, supervision, * * * excessive discipline, and then just educating on some parenting skills." Armstrong testified that Samantha completed a parenting curriculum called "Active Parenting." Armstrong was satisfied with Samantha's performance and understanding of the parenting curriculum. However, Armstrong was not able to see if Samantha benefited from the class because the children never came back to her home. Armstrong and Samantha never discussed how she would keep her children safe if they were returned to her.

{¶20} Samantha testified that she has lived on her own for approximately two months and before that she was living with Brandon. She and Brandon have been together as a couple for about nine years. Samantha testified that she and Brandon thought it would be best if they lived apart because of everything that had been going on

with the children and then the new child abuse accusation "was kind of like an extra nudge for him to go." Samantha testified that she is renting a six-bedroom home, has her driver's license, and has recently become employed at Eclipse in The Plains where she does food prep. Samantha testified that she has not met in person with her substance abuse counselor since she started working because of scheduling issues. She also feels that working has helped her with her substance abuse issues because she is not staying cooped up and away from everyone. Samantha admitted that she refused to take a drug screen with Driggs, but said it was because she was upset that Murray had not performed the home inspection and she wanted her out to do that before Samantha was willing to cooperate with a drug screen.  Samantha said she plans to continue working if the children were returned to her and she would have her aunt come to her house to watch them. Samantha said that she would continue the children's counseling sessions and understands that they have gone through "a good bit of trauma." Samantha understands that the children had been having sexual contact with each other and that she plans to have the child she believed to be the main instigator in a bedroom next to hers. She also has motion sensors and alarms that were provided by the Agency that she plans to install in the children's bedrooms. Samantha testified that if the allegations that Brandon had sexually abused C.C. were true then she would forbid him from seeing any of the children. Samantha said she was never accused of physically or sexual abusing any of her children and that she has a good relationship with them and is a stable supportive person that her children rely upon. She testified that one of the foster care givers would call her to have her help locate the children when they ran away or to calm them down. Samantha believed it was in the children's best interest to be returned to her custody.

{¶21} Samantha testified that she separated from Brandon once before earlier in the case when he tested positive for cocaine, but then she got back together with him because "he played the dad to my kids for years. We've been together for years. I didn't just want to start over now." Samantha also testified that in May 2023 unbeknownst to her, her cousin was hiding from the police in the basement of her house and she told the police he was not inside because she did not know he was in her home. Samantha testified that she supports Brandon's request to be granted legal custody of B.A. and she hopes to be able to stay in B.A.'s life because she is the only real mother B.A. has known. Samantha and Brandon's plan is for Brandon to regain custody of B.A. and Samantha would regain custody of J.C., A.C., C.C., and D.A. and then Samantha and Brandon would co-parent D.A.

{¶22} Traci Winchell testified that she was the CASA volunteer assigned to the case and began working on it in March 2022. She recommended that permanent custody of the children be granted to the Agency because it would be necessary for their safety. Winchell testified that the children have all disclosed severe physical abuse by Brandon. The children all want to be with their mother but they do not want Brandon to be there. Winchell acknowledged that Samantha has made many positive changes and is moving in the right direction, but Samantha testified that she will still be maintaining a relationship with Brandon, with plans to co-parent with him, and Winchell believes that a continued relationship with Brandon is not in the children's best interest.

{¶23} The permanent custody hearing concluded on August 3, 2023, but on September 22, 2023, Samantha and Brandon filed a joint motion for the court to consider new evidence. They alleged that the investigation of the sexual abuse allegations against

Brandon by C.C. were concluded, and no criminal charges were being pursued. The Agency opposed the motion on the ground that an additional hearing was unnecessary as the Agency would stipulate that no criminal charges were filed against Brandon.

{¶24}   On October 4, 2023, the court issued a judgment entry denying the parents' request for an additional hearing and granting the Agency permanent custody of the children. The court found that the children had been in the temporary custody of the Agency for 12 or more months of a consecutive 22-month period for purposes of R.C. 2151.414(B)(1)(d). The court also found that it was in the best interest of the children to award permanent custody to the Agency.

## II.  ASSIGNMENT OF ERROR

{¶25}  Mother presents one assignment of error:

The juvenile court's decision terminating Samantha's parental rights was against the weight of the evidence.[1]

## III.  LEGAL ANALYSIS

### A.  Permanent Custody Award

{¶26} In her sole assignment of error, mother contends that the permanent custody award was against the manifest weight of the evidence. Mother asserts that the trial court terminated her rights to her children because of the abusive conduct of the father[2] and because the guardian ad litem "had no intention of ever allowing the children to be returned to her." She argues that while there is ample evidence that the father

---

[1] Mother's brief contains an argument that the juvenile court abused its discretion when it approved the temporary visitation suspension in June 2023. Mother does not raise a separate assignment of error contesting the trial court's decision and the argument appears to be made to support her existing assignment of error.

[2] For simplicity, the parties and this court refer to Brandon as "father" even though, with respect to D.A., his paternity has not been established and he is not the step-father or biological father of C.C., A.C., or J.C.

abused the children and many of them do not want him around, there was no evidence she abused the children and all the children stated that they wanted to return to her. She argues that the trial court's decision "relies heavily on the recommendation of the GAL who essentially conceded that because of the past events there was nothing Samantha could do to satisfy her enough to recommend returning custody to her."

### B. Standard of Review

{¶27} "A reviewing court will not reverse a trial court's judgment in a permanent custody case unless it is against the manifest weight of the evidence." *In re C.S.*, 4th Dist. Pike No. 19CA899, 2019-Ohio-5109, ¶ 21. We have explained:

> "To determine whether a permanent custody decision is against the manifest weight of the evidence, an appellate court must weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether in resolving evidentiary conflicts, the trial court clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed and a new trial ordered." [*In re T.J.*, 4th Dist. Highland Nos. 15CA15, 15CA16, 2016-Ohio-163,] ¶ 25, citing *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, 972 N.E.2d 517, ¶ 20. In reviewing evidence under this standard, we defer to the trial court's determinations of matters of credibility, which are crucial in these cases, where demeanor and attitude are not reflected well by the written record. *Eastley* at ¶ 21; *Davis v. Flickinger*, 77 Ohio St.3d 415, 419, 674 N.E.2d 1159 (1997).
>
> In a permanent custody case the dispositive issue on appeal is "whether the trial court's findings * * * were supported by clear and convincing evidence." *In re K.H.*, 119 Ohio St.3d 538, 2008-Ohio-4825, 895 N.E.2d 809, ¶ 43; R.C. 2151.414(B)(1). "Clear and convincing evidence" is "that measure or degree of proof which is more than a mere 'preponderance of the evidence,' but not to the extent of such certainty as is required 'beyond a reasonable doubt' in criminal cases and which will produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established." *Cross v. Ledford*, 161 Ohio St. 469, 120 N.E.2d 118 (1954), paragraph three of the syllabus; *State ex rel. Pietrangelo v. Avon Lake*, 149 Ohio St.3d 273, 2016-Ohio-5725, 74 N.E.3d 419, ¶ 14. "[I]f the children services agency presented competent and credible evidence upon which the trier of fact reasonably could have formed a firm belief that permanent custody is

warranted, then the court's decision is not against the manifest weight of the evidence." *In re R.M.*, 2013-Ohio-3588, 997 N.E.2d 169, ¶ 55 (4th Dist.).

(First alteration added.)  *Id.* at ¶ 21-22.

### C.  Statutory Framework and Analysis

**{¶28}**  Under R.C. 2151.414(B)(1), a juvenile court may grant permanent custody to a public children services agency if the court determines by clear and convincing evidence that (1) any of the circumstances in R.C. 2151.414(B)(1)(a) through (e) apply, and (2) it is in the best interest of the child.  In this case, the juvenile court found that R.C. 2151.414(B)(1)(d) applied, i.e., "[t]he child has been in the temporary custody of one or more public children services agencies * * * for twelve or more months of a consecutive twenty-two-month period * * *."  Mother does not dispute that the children were in the temporary custody of the Agency for the requisite time; therefore, we must affirm the permanent custody award unless the juvenile court's best interest determination is against the manifest weight of the evidence.

**{¶29}**  R.C. 2151.414(D)(1) states:

In determining the best interest of a child * * * the court shall consider all relevant factors, including, but not limited to, the following:

(a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;

(b) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;

(c) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies * * * for twelve or more months of a consecutive twenty-two-month period * * *;

(d) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;

(e) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child.

For the purposes of division (D)(1) of this section, a child shall be considered to have entered the temporary custody of an agency on the earlier of the date the child is adjudicated pursuant to section 2151.28 of the Revised Code or the date that is sixty days after the removal of the child from home.

No one factor has "greater weight or heightened significance." *In re C.F.*, 113 Ohio St.3d 73, 2007-Ohio-1104, 862 N.E.2d 816, ¶ 57.

**{¶30}** The juvenile court acknowledged the sincerity of effort that Samantha and Brandon exhibited throughout the proceedings. "Too often this Court has hearings where no parent cares enough to even appear in Court.  The courtesy shown by [Samantha and Brandon], their good intentions, and attendance is noted and appreciated." The juvenile court also acknowledged that both parents have engaged in several services and "made attempts to better themselves and their parenting capacities." However, the court viewed the key factor in the case to be the parents' ability to provide protection to the children, "this case hinges on the parent's ability to provide a protective capacity and the Court heard testimony that put that capacity severely in doubt."

**{¶31}** The juvenile court noted that throughout the case Samantha and Brandon had shown lapses in judgment and refusal to take responsibility. The lack of progress meant that Samantha and Brandon's visitations did not progress beyond on-site supervised visitation with the children, "The lack of substantial progress did not warrant even unsupervised or off-ground visits, let alone trial home visits." The court reviewed the factors governing the best interest of the children and found by clear and convincing

evidence that it was in the children's best interest to grant permanent custody to the Agency.

1. Interactions and Interrelationships of the Children

**{¶32}** The court noted that the biological father, Thomas, had not engaged with any of his children (J.C., A.C., and C.C.) throughout the case and has not appeared at a single hearing. However, both Brandon and Samantha had visited their children and their interactions appeared to be appropriate. However, the court noted that the visitation has been entirely in a supervised setting and that there were historical concerns that Brandon has been physically abusive, and Samantha has failed to recognize these dangers. The historical trauma the children suffered has affected them greatly and they need therapy and/or residential placement. The court found that although the parents have engaged in services, they have not benefitted to the point "that it would be necessary to parent these children that have potential high-risk situations."

**{¶33}** Samantha argues that the juvenile court's decision to suspend her visitation during the investigation into the new allegations of Brandon's sexual abuse against C.C. prejudiced her ability to exhibit her parenting skills off site. She argues that the reason she failed to make sufficient progress to off-site visitation with the children, "is that the trial court prevented her from doing so by suspending her visitation pending an investigation into allegations involving the father," not her. She contends the juvenile court prevented her from creating the evidence of parenting that she needed and failed to "explain how it expected Samantha to show she would manage unsupervised and off-site visits when [it] prevented her from having any visits at all." Samantha also argued that the guardian ad litem was prejudiced against her and "was neither objective nor fair"

and used phrases like her "mom heart" when explaining why she believed visitation should be suspended pending the sexual abuse investigation.

**{¶34}** The temporary visitation suspension that Samantha complains of did not occur until June 26, 2023. The Agency filed an amended case plan on June 26, 2023 that proposed that visitation between the children and the parents be temporarily suspended pending an investigation of recently made allegations by C.C. that Brandon sexually abused her. The parents objected to the suspension and the juvenile court held a hearing on it on June 26, 2023. The trial court approved the visitation suspension because of concerns that both Samantha and Brandon would attempt to interfere with the investigation through their interactions and conversations with the children. This case commenced on November 12, 2021 – 19 months before the temporary suspension of visitation took place. Samantha had all of December 2021, the entire year of 2022, and half of 2023 to show that she was capable of unsupervised parenting. But, she could neither consistently produce clean drug screens nor acknowledge the exceptional risk her long-term partner posed to the physical safety of her children. Her attempt to foist the blame for her failure to make progress in visitation upon the trial court for a temporary visitation suspension imposed at the *end of June 2023* is unpersuasive and unsupported by the evidence.

**{¶35}** Samantha also argues that the juvenile court did not consider how well her supervised visitations went and how her interactions were loving and kind. However, the juvenile court did acknowledge the amount of effort and involvement Samantha had throughout the case. However, the problem the court noted was that Samantha was

unable to progress to the point where she was able to have unsupervised visitation with the children at any time during the pendency of the case.

### 2.  Wishes of the Child

**{¶36}** The juvenile court found that the children can express their wishes, but that they have waivered in their desires throughout the case. Samantha's children want to go live with her if Brandon is not around. The juvenile court found that the guardian ad litem has been vocal in advocating on behalf of the children, and she did not recommend reunification because "she believes the environment is not safe for the children."

**{¶37}** Samantha argues that the evidence clearly showed that the children wanted to be with her and even the guardian ad litem acknowledged this. However, the crux of the finding is not that the children wanted to be with Samantha – all the witnesses and the court agreed that is what they wanted. But that is only half of what they wanted. The children emphatically did not want to be with Brandon and they did not want to be with Samantha if it meant also being with Brandon. It was clear from Samantha's testimony that she planned to continue a relationship with Brandon and that she planned to co-parent several of the children with him. Samantha's testimony about her past break up with Brandon and her reason for getting back with him shows her lack of appreciation for the danger he posed to her children. She testified that she separated from Brandon for a few months after she learned he had cocaine in his drug screens. She testified that she got back together with him and allowed him to move back into her home, "Because he played the dad to my kids for years. We've been together for years. I didn't just want to start over now."

**{¶38}** Samantha also argues that the guardian ad litem opinion differed from the children's wishes and did not consider Samantha's efforts under the plan. She contends that the guardian ad litem based her entire opinion on what had happened in the past. However, the guardian ad litem testified that she interviewed the children and four of five children reported physical abuse by Brandon, such as "being choked, and picked up off the floor by the neck." She testified that she believed that permanent custody with the Agency was the best outcome because even though the children want to be with their mother, they do not want Brandon to be there and they do not want their mother to continue a relationship with him. She acknowledged that the children's wishes were to be with their mother, but it was in their best interest to be with the Agency because of the mother's continued relationship with Brandon:

> Q. Okay. There is nothing she can do now?
>
> A. She testified that she will maintain a relationship with Brandon.
>
> Q. I don't recall hearing that.
>
> A. And that they are going to co-parent. Those were her words, not mine. She testified that, and that they will co-parent, and that she won't force the girls to go around him, but is going to maintain a relationship with Brandon and that is not in the children's best interest.

The guardian ad litem's testimony was not, as Samantha contends, fixated on the past, but was concerned with Samantha's ongoing relationship with Brandon despite the fact that the relationship was not in line with her children's wishes or their best interests.

### 3. Custodial History

**{¶39}** The children were removed from the parent's custody on December 2, 2021 and were in the temporary custody of the Agency for 12 or more months of a consecutive 22-month period. At the time of the final day of the permanent custody hearing the children

had been in the Agency's custody continuously for 21 months. Samantha never progressed to unsupervised visitation with the children.

4. Legally Secure Permanent Placement

**{¶40}** The Ohio Revised Code does not define the phrase "legally secure permanent placement," but "this court and others have generally interpreted the phrase to mean a safe, stable, consistent environment where a child's needs will be met." *In re M.B.*, 4th Dist. Highland No. 15CA19, 2016-Ohio-793, ¶ 56. "A legally secure permanent placement is more than a house with four walls. Rather, it generally encompasses a stable environment where a child will live in safety with one or more dependable adults who will provide for the child's needs." *Id.*

**{¶41}** The juvenile court found that a legally secure permanent placement could not be achieved without a grant of permanent custody to the Agency. The Agency presented evidence that two of the children are in foster care and three of the children are in various qualified residential treatment programs and all are receiving extensive mental health services to help them address the trauma suffered. The court found that permanent custody will enable to the children to be in "a safe environment that will allow them to thrive, but also to have the necessary resources to further their development, both physically, mentally and therapeutically."

> These children have lived through chaos for the majority of their lives. While the Court is concerned with the multiple placements of the children throughout this case, it is entirely conceivable that this has occurred due to the past trauma endured by the children. The agency has had over 100 screened referrals for this family and these children. Again, the Court recognizes that these are simply referrals, but the sheer number exhibits the chaos that was present in these children's lives.

**{¶42}** Samantha argues that her testimony supports a finding that she can provide a legally secure placement for the children. She testified that she and Brandon are now living separately, and she has a lease on a home that provides sufficient living space for the children, she obtained a driver's license and a job, and would install the appropriate cameras and alarms to ensure the children were safe. Samantha testified that she decided to live separately from Brandon because of "everything that's going on with the kids right now." Samantha admitted that they established separate housing because she "felt that would provide perhaps the best chance of regaining custody." Samantha also admitted that it was "only recently" that she obtained a job and renewed her driver's license, which she had let expire.

**{¶43}** Samantha also argues that her mental health counselor, Fox, at Integrated Services testified that she obtains services without their assistance, advocates for medication for her children, and understands the need for ongoing counseling for her children. However, Fox also testified that Samantha never expressed concerns about her children having been physically or sexually abused and she has no way, other than Samantha's own self reporting, to know whether she has benefitted from parenting classes. Samantha has also not talked to Fox about her plans to keep the children safe while they are in her home, if they are returned to her. Additionally, her drug counselor, Brooks, testified she interacts with Samantha "sporadically" and had not seen her in person since March 2023 and that Samantha has failed drug screens performed by Brooks. Samantha argues that her testimony and the testimony of her mental health and drug counselors shows that the weight of the evidence supports a decision to deny permanent custody to the Agency.

**{¶44}** However, none of those witnesses addressed the issue the juvenile court identified as the critical factor this case "hinges on" – "the parent's ability to provide a protective capacity." Therefore, their testimony added little to the most important issue in this case. Additionally, even though Samantha is living separately from Brandon, that has happened before. But she let him move back in after a few months because they have been together for nine years and she "didn't just want to start over now." In fact, several of the major developments in the case were very recent and occurred well into the permanent custody hearing. Her job was a recent development – there is no evidence in the record that Samantha has any successful work history or ability to maintain employment. She testified that during most of the past nine years, while she has been together with Brandon, she has been unemployed and stayed home. The juvenile court determines what weight and credibility to give a witness's testimony. The juvenile court was in the best position to judge credibility, and we defer to its credibility determinations. *In re C.S.*, 4th Dist. Pike No. 19CA899, 2019-Ohio-5109, ¶ 21.

### 5. R.C. 2151.414(E)(7) to (E)(11) Factors

**{¶45}** The juvenile court did not identify any factors in R.C. 2151.414(E)(7) to (E)(11) and there is nothing in the parties' briefs or the record to indicate they are applicable to this case.

### 6. Totality of the Circumstances

**{¶46}** Samantha's inability or refusal to acknowledge the physical harm her partner caused and the risk he continued to pose to her children existed throughout the case and up to the very end. At the permanent custody hearing, Samantha testified and expressed skepticism of the sexual abuse allegations due to concerns that her children

may be bribed to say and do things. She testified that she had not had a chance to talk to C.C. to determine if she had been bribed or influenced by someone else to make the allegations. Samantha speculated that C.C. borrowed the story from another abused girl, "[C.C.] is also a follower and where she was in that facility and had heard one of the other girls talking" and then "associated it with herself cause she's been known to do that."

{¶47} Samantha testified that she supports Brandon regaining custody of B.A, and that she and Brandon will co-parent D.A. Well into a year and a half of the proceedings, Samantha still refused to acknowledge or accept that Brandon was a danger to her children. At the permanent custody hearing, Samantha was asked about the allegations of physical abuse by Brandon against the children and she testified that she had never witnessed it, had no reason to believe it ever happened, and she did not believe any sexual abuse by Brandon against any of her children had ever occurred.

{¶48} The Agency witnesses and the guardian ad litem all testified that Samantha had made efforts – the juvenile court was clear that Samantha had done much more than others similarly situated – but the biggest issue was her inability to protect her children from her abusive partner. She never acknowledged the abuse, instead describing it as "over disciplining" and she described two of the children's black eyes as coming from accidents or "rough housing." The most Samantha would concede was that Brandon was "physically aggressive" with her children. Even though she knows none of her children want to be around him, she continues to have a relationship with him.

{¶49} Based on the foregoing, we conclude the juvenile court's best interest finding is not against the manifest weight of the evidence. The Agency presented competent and credible evidence upon which the court reasonably could have formed a

firm belief that a grant of permanent custody to the Agency was in the best interest of the children.  Accordingly, we conclude that the permanent custody award is not against the manifest weight of the evidence, overrule the sole assignment of error, and affirm the juvenile court's judgment.

JUDGMENT AFFIRMED.

## **JUDGMENT ENTRY**

It is ordered that the JUDGMENT IS AFFIRMED and that appellant shall pay the costs.

The Court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this Court directing the Athens County Common Pleas Court, Juvenile Division, to carry this judgment into execution.

Any stay previously granted by this Court is hereby terminated as of the date of this entry.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

Abele, J. & Wilkin, J.: Concur in Judgment and Opinion.


For the Court



BY: _____
     Michael D. Hess, Judge



## NOTICE TO COUNSEL

**Pursuant to Local Rule No. 14, this document constitutes a final judgment entry and the time period for further appeal commences from the date of filing with the clerk.**