[Cite as *In re K.K.*, 2025-Ohio-1282.]

IN THE COURT OF APPEALS OF OHIO
FOURTH APPELLATE DISTRICT
ATHENS COUNTY

| | | |
|---|---|---|
| In re: K.K. (DOB: 09/07/2007) | : | Case No. 24CA36 |
| | : | <u>DECISION AND</u> |
| An Adjudicated Dependent Child | | <u>JUDGMENT ENTRY</u> |
| | : | |
| | | **RELEASED 4/07/2025** |

_____

<u>APPEARANCES</u>:

Christopher Bazeley, Cincinnati, Ohio, for appellant.

Brittany E. Leach, Athens County Assistant Prosecutor, Athens, Ohio, for appellee.
_____

Hess, J.

{¶1} The father of K.K. appeals a judgment of the Athens County Court of Common Pleas, Juvenile Division, granting permanent custody of the child to Athens County Children Services ("Agency"). Father asserts two assignments of error: (1) the juvenile court's decision terminating his parental rights is against the manifest weight of the evidence and (2) his trial counsel was ineffective for failing to request a continuance to allow him to prepare for reunification. For the reasons that follow, we find that the manifest weight of the evidence supported the juvenile court's decision to terminate father's parental rights, and that trial counsel was not ineffective for failing to request a continuance. We overrule the assignments of error and affirm the juvenile court's judgment.

## I. FACTS AND PROCEDURAL HISTORY

{¶2} On May 15, 2024, the Agency filed a complaint alleging that K.K. was abused, neglected, and dependent and requested it be granted permanent custody. The

child had been previously placed in the Agency's temporary custody in a prior proceeding. The Agency alleged that there was a conflict in the home between the child and the mother that had resulted in the child seeking medical care at a hospital for injuries. The child expressed no interest in reunification with the mother. The Agency further alleged that the mother failed to ensure that the child regularly attended school and when the child was in school, the child had problems staying awake during class. The father had convictions for domestic abuse, aggravated burglary, and burglary and was incarcerated at the time of the complaint. The complaint further alleged that the parents have another child that has been adjudicated and placed in the temporary custody of the Agency. At an adjudication hearing in July 2024, the parties stipulated that the child was dependent, and the Agency dismissed the allegations of abuse and neglect.

{¶3} The permanent custody hearing was held in September 2024. Ms. Rebecca Inboden, a caseworker with the Agency, testified that K.K. was 17-years old and in the temporary custody of the Agency since May 1, 2024 and was previously in the Agency's temporary custody from June 2021 through October 2023. Thus, for the majority of the past three years, K.K. has been in the Agency's temporary custody. The Agency has had over 50 referrals regarding this family over the past several years, with at least 2 findings of physical abuse and emotional maltreatment. Mother's ex-husband had engaged in physical abuse of mother and the child. Although the mother divorced him, during an unannounced home visit a week before the hearing, Ms. Inboden witnessed the ex-husband pull up to the home, open the garage, and enter the home. Ms. Inboden was concerned about this as it showed that he has access to the child should the child be reunified with mother. Ms. Inboden testified that there were other paramours coming and

going from mother's house and that the child told her these individuals were threatening the child's physical safety and well-being. The Agency became most recently involved with K.K. in late April 2024 after K.K. alleged that mother punched K.K. in the nose, which required medical attention.

**{¶4}** Ms. Inboden testified that K.K. has complex needs stemming from diagnoses of attention deficit hyperactivity disorder, disruptive behavior disorder, and oppositional defiant conduct disorder. K.K. requires "an immense amount of patience, and guidance, and intervention . . . on a daily basis to get [K.K.] to do what needs to be done to function." Mother has not demonstrated that she is able to care for the child's behavioral and mental needs despite extensive casework counseling and intensive outpatient therapy. K.K. has been placed in a group home since May 2024 and receives psychiatric and individual counseling, with a heavy focus on preparing for independent living due to K.K.'s age. K.K. expressed a desire to remain in the group home rather than reunite with mother. However, if father obtains safe, stable housing, K.K. would be willing to reunify with him.

**{¶5}** Ms. Inboden testified that father's case plan objective was to notify the Agency if he had changes in his housing status. Ms. Inboden testified that father is not in a position to reunify because he was living in a half-way house, and then in sober living and he is not able to have K.K. live with him in sober living. Father has been unable to parent K.K. due to his incarceration and subsequent living arrangements. Ms. Inboden testified that father has had telephone contact with K.K. but has had no in-person visits. Ms. Inboden testified that she did not recommend that K.K. be reunified with father because he is lacking safe, stable, independent housing and is currently working on

rebuilding his life after "being incarcerated for such an extended period of time" and for that reason, "he's not currently in a position to reunify." Ms. Inboden testified that relative placement was explored but none was found suitable and that her concerns about placing K.K. with one of the parents is that K.K. has "complex needs that would overwhelm even the most functional caregivers."

{¶6} Mother testified that she wants K.K returned to her because she is K.K.'s mother. Mother also testified that she would take parenting classes if the child was returned to her, though she was not taking them at the time of the hearing. However, mother conceded she had not seen or spoken to K.K. since May 2024 when K.K. was placed in the temporary custody of the Agency.

{¶7} Father testified that he had been incarcerated up until May 2024. Then, he went into a half-way house for incarcerated individuals in Ross County and then went into sober living in Pickaway County. He is employed fulltime at an injection plastic mold factory and works from 11:45 p.m. until 8:00 a.m. Father testified that he is eligible to leave the sober living facility in the middle of the current month (about a week after the hearing date) and was open to either getting an apartment or moving to Pike County where he has property. Father testified that he requested zoom call contact with K.K. and would like to start personal visits if K.K. would agree. Father believes his telephone conversations with K.K. have gone well. Father testified that he believed additional time would be helpful for him to improve his situation so that he can "touch base with Children Services and get more involved in the case plan" and "it would help me in finding a location." Father also testified that he was engaged in divorce proceedings with his current wife and "Pickaway County has asked me to stay in Pickaway County during the

proceedings of the divorce." Father also testified that he speaks with K.K.'s therapist at least once a month to try to avoid topics of conversation that will upset K.K. Father testified that K.K. has expressed interest in living with him whether it be "during these court proceedings" or after "I have stable housing and he's turned 18."

{¶8} Father testified that he was incarcerated for 2 years, since May 2022, and the 18 months that he was sober, he had either been incarcerated or in sober living. Prior to being incarcerated in 2022, father testified that the last time he saw K.K before he was incarcerated in 2022, was in 2019 for approximately one week. Prior to the one week in 2019, he last saw K.K. in approximately 2016 when K.K. was either seven or nine years old. Father conceded he went many years without seeing K.K. prior to his incarceration. Father testified that K.K. and another child lived with him from birth until approximately age seven or nine. However, father lost custody due to a neglect and abuse case in Pike County, Ohio in approximately 2014. Father testified that he "pled guilty to some charges of neglect and abandonment and I left [sic] the children stay [with mother] because I felt they were solid and structured, and there was visitation established that should have worked out but it didn't." Father also testified that in addition to K.K. and K.K.'s brother, father had three other biological children. When asked who has custody of father's other three biological children, father testified, "I have no clue." Father believed one or perhaps two of the children had been adopted. Father testified that if K.K. were returned to him, his sister would supervise K.K. from 11:30 p.m. to 8:00 a.m. while he was at work. Father testified that it would take him approximately six months to work out a new housing situation if K.K. were returned to him.

{¶9} The guardian ad litem testified that her recommendation was to grant permanent custody to the Agency. She testified that it would be in K.K.'s best interest because the child has been in and out of Agency care for so many years and deserves stability and permanency. The guardian ad litem also expressed concern with the fact that K.K. was not able to move to a less restrictive environment than the group home setting because behavior issues were still a concern. The guardian ad litem did not recommend reunification with father because of the length of time, the history he has, and that he does not have stable independent housing. The guardian ad litem believed that contact between father and K.K. could continue even if the Agency was granted permanent custody.

{¶10} The juvenile court terminated the mother and father's parental rights and granted the Agency permanent custody of K.K. The juvenile court determined that the child cannot be placed with one of the parents within a reasonable time or should not be placed with either parent and that it was in the best interest of the child to be placed in the permanent custody of the Agency.

{¶11} The court found that, under the factors in R.C. 2151.414(E)(1), (4), and (16), there was clear and convincing evidence that the child cannot be placed with either parent within a reasonable time and should not be placed with the parents. It found that there had been "significant agency involvement with this family" and that problems existing three years ago are still an issue. It found that the child "has lived in pure chaos for most of the child's life," "is behind educationally, emotionally, and mentally," and that "this lack of development can be directly related to the chaos in the home." The juvenile court found that the parents love the child, but that "even with services by others, the likelihood that

this child is neglect[ed] or abused remains high." The juvenile court found that the mother has had a volatile relationship and is involved in risky relationships and places the child at risk without seeing "the nexus between the risk and her relationships." Due to the volatile physical altercations, the child expressed unwillingness to reunify with mother or to even speak with her.

{¶12}  The juvenile court found that the father had been incarcerated for a majority of the case and during the prior case before the court. Even though the father has "made strides with his sobriety since his release from incarceration," the court found that the father "is not in a position to adequately and safely parent this child" because he lacks appropriate housing and resources.

{¶13}  After examining the factors in R.C. 2151.414(D)(1)(a)-(e), the juvenile court determined that it was in the best interest of the child to grant the Agency permanent custody. In reviewing the interaction and interrelationship of the child with parents and other significant persons, the juvenile court found that the 17-year-old child has had multiple temporary placements with the Agency due to a turbulent and volatile relationship with mother. The mother and child had no communications for at least six months and the child has had only "some communication with Father." The father only recently began communications with the child but is currently living in "a sober living environment and is not in a position to parent this child."

{¶14}  In examining the wishes of the child, the juvenile court found that the child "continuously verbalized" the wish not to reunify with mother. The child expressed a willingness to live with father, but "the minor child recognized that Father is not in a position to reunify with the child." The juvenile court noted the guardian ad litem's

recommendation that permanent custody be awarded to the Agency based on the child's need for stability and permanency.

**{¶15}** The juvenile court found that the custodial history of the child was concerning because the Agency's involvement has been significant during the past three years. Even though the mother was able to regain custody during the prior proceedings, that did not last long due to "conflict and behaviors within the home." The court found, "The historical concerns that were present three (3) years ago, still remain today. It is highly unlikely that this will change in the future."

**{¶16}** Finally, the juvenile court found that the child's need for a secure placement could not be achieved without granting the Agency permanent custody. The court found that the "dysfunction with this family is prevalent on multiple levels." The child is developmentally behind in many ways, which the court attributed to the living environment with the parents. The mother and child have "demonstrated physical aggression towards each other" and the father has been incarcerated for a significant portion of the time. The family "has historically struggled to provide for the child's basic needs." The court recognized that services had been provided to the mother, but that the mother has not benefited from the services and "is unable or unwilling to adapt her parenting practices so that this child can thrive."

**{¶17}** Following the grant of permanent custody of K.K. to the Agency, the father appealed.

## II. ASSIGNMENTS OF ERROR

**{¶18}** Father presents the following two assignments of error:

The trial court's decision terminating [father's] parental rights is against the weight of the evidence.

[Father's] trial counsel was ineffective for failing to request a continuance to allow him to prepare for reunification.

### III.  LAW AND ANALYSIS

### A.  Permanent Custody Award

#### 1. Standard of Review

**{¶19}** "A reviewing court will not reverse a trial court's judgment in a permanent custody case unless it is against the manifest weight of the evidence." *In re C.S.*, 2019-Ohio-5109, ¶ 21 (4th Dist.). We have explained:

> "To determine whether a permanent custody decision is against the manifest weight of the evidence, an appellate court must weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether in resolving evidentiary conflicts, the trial court clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed and a new trial ordered." In reviewing evidence under this standard, we defer to the trial court's determinations of matters of credibility, which are crucial in these cases, where demeanor and attitude are not reflected well by the written record.
>
> In a permanent custody case the dispositive issue on appeal is "whether the trial court's findings * * * were supported by clear and convincing evidence." "Clear and convincing evidence" is "that measure or degree of proof which is more than a mere 'preponderance of the evidence,' but not to the extent of such certainty as is required 'beyond a reasonable doubt' in criminal cases and which will produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established." "[I]f the children services agency presented competent and credible evidence upon which the trier of fact reasonably could have formed a firm belief that permanent custody is warranted, then the court's decision is not against the manifest weight of the evidence."

(Citations omitted.) *Id.* at ¶ 21-22.

#### 2. Statutory Framework and Analysis

**{¶20}** R.C. 2151.414(B)(1) specifies that a trial court may grant a children services agency permanent custody of a child if the court finds, by clear and

convincing evidence, that (1) the child's best interest would be served by the award of permanent custody, and (2) if the following conditions applies:

> (a) The child . . . cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents.

**{¶21}** The juvenile court found that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent, and thus, that R.C. 2151.414(B)(1)(a) applies. In determining whether a child cannot be placed with either parent within a reasonable time or should not be placed with either parent, R.C. 2151.414(E) requires the trial court to consider "all relevant evidence" and outlines the factors a trial court "shall consider." If a court finds, by clear and convincing evidence, the existence of any one of the listed factors, "the court shall enter a finding that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent." The juvenile court found that R.C. 2151.414(E)(1), (4), and (16) applied and that the child could not be placed with either parent within a reasonable time or should not be placed with either parent.

**{¶22}** Father contends that the juvenile court's finding that the child could not be placed with him was not justified by the record because he had been living in a sober living facility in Pickaway County and had been sober for 18 months. Father also testified that he is aware of the child's needs and "it drives me that much more" to gain custody. Father also testified that he works a full-time job in Pickaway County and is willing to move out of sober living into an apartment or into "an old structure" on a property in Pike County that he could remodel.

**{¶23}** The manifest weight of the evidence supports the juvenile court's determination that K.K. could not be placed with father within a reasonable time and

should not be placed with father. Father has had little to no contact with K.K. for approximately a decade and only recently began communicating with K.K. by telephone. Father has no recent history parenting K.K. or dealing with the child's complex emotional issues. Father testified that when he last was the primary caregiver of K.K. when the child was seven or nine, he lost custody due to charges of neglect or abandonment. Additionally, father had only recently been released from prison and did not have living arrangements that would allow him to have K.K. reside with him. The record shows that father has done extremely well in maintaining sobriety and employment and the juvenile court properly lauded father for his self-improvement efforts. However, father presented no evidence that he was capable of parenting K.K. or that he could find appropriate housing within a reasonable time. Thus, we find that the juvenile court's findings under R.C. 2151.414(B)(1)(a) were supported by clear and convincing evidence.

{¶24} Father also contends that the best interest factors are also in his favor. R.C. 2151.414(D)(1) states:

> In determining the best interest of a child * * * the court shall consider all relevant factors, including, but not limited to, the following:
>
> (a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;
>
> (b) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;
>
> (c) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies * * * for twelve or more months of a consecutive twenty-two-month period * * *;
>
> (d) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;

(e) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child.

No one factor has "greater weight or heightened significance." *In re C.F.*, 2007-Ohio-1104, ¶ 57; *In re D.A.*, 2024-Ohio-1416, ¶ 27-30 (4th Dist.).

### a. The Interaction and Interrelationship of the Child

**{¶25}** The father argues that this factor is in his favor because the guardian ad litem testified that she believes father loves K.K. and father's own testimony was that he has meaningful telephone conversations with K.K.

**{¶26}** However, we find that the evidence supports the juvenile court's determination of this factor. The juvenile court found that K.K.'s relationship with the parents, including father, has been chaotic and unpredictable. Father has not parented K.K. and has had almost no contact with K.K. for approximately ten years. K.K. has been in and out of the Agency's custody. Father has only recently started communicating with K.K., has been incarcerated for much of the past two years, and is not in a position to parent K.K. The trial court properly weighed this factor against the father.

### b. Wishes of the Child

**{¶27}** Father argues this factor is in his favor because K.K. expressed a willingness to live with him. However, the testimony at the hearing was that the child expressed a desire to remain in the group home setting. K.K. would be willing to live with father if he had appropriate housing, but K.K. recognized father does not currently have appropriate housing. The guardian ad litem, who also represents the interests of K.K., recommended permanent custody to the agency. This factor weighs against the father.

### c. Custodial History

**{¶28}** The father concedes that this factor weighs against him because K.K. had been in the Agency's custody from June 2021 through October 2023 and then again in May 2024. We agree and find that the evidence supports the juvenile court's finding that the custodial history is concerning and that the issues that placed K.K. in Agency custody three year ago still exist.

### d. Legally Secure Permanent Placement

**{¶29}** The Revised Code does not define the phrase "legally secure permanent placement," but "this court and others have generally interpreted the phrase to mean a safe, stable, consistent environment where a child's needs will be met." *In re M.B.*, 2016-Ohio-793, ¶ 56 (4th Dist.). "A legally secure permanent placement is more than a house with four walls. Rather, it generally encompasses a stable environment where a child will live in safety with one or more dependable adults who will provide for the child's needs." *Id.*

**{¶30}** Father argues that this factor falls in his favor because he has housing options, including rehabbing a property he already owns. However, father presented no evidence about the condition of that alleged residence, the length of time it would require to rehab it, the estimated costs of rehab, or how he was going to finance the rehab. Father also argues that he would work to accommodate K.K.'s mental health needs and that his sister could help him with the nighttime care and transportation while he works to reinstate his driver's license. However, his testimony is evidence that father would not be able to care for K.K., but instead would rely heavily on other adults for the nightly care and all transportation needs of K.K.

**{¶31}** The evidence supports the juvenile court's finding that a legally secure permanent placement could not be achieved without a grant of permanent custody to the Agency. The juvenile court found that the father had been unable to care for or provide stable parenting for the child due to father's incarceration and that the child would have little chance to succeed prior to reaching adulthood, or be able to navigate adulthood, if the child were returned to either parent.

e.  Factors in R.C. 2151.414(E)(7) to (E)(11)

**{¶32}** The juvenile court found that R.C. 2151.414(E)(7) to (E)(11) were not applicable.  Father does not contest this.

**{¶33}** After reviewing the evidence, we find that the juvenile court's decision to award permanent custody to the agency and terminate father's parental rights was not against the manifest weight of the evidence. We overrule father's first assignment of error.

B. Ineffective Assistance of Trial Counsel

**{¶34}** Father contends that his trial counsel was ineffective for failing to request a continuance to give him more time to make progress towards regaining custody of K.K.

**{¶35}** To overturn a permanent custody judgment on the basis of ineffective assistance of counsel, appellant must establish "(1) deficient performance by counsel, i.e., performance falling below an objective standard of reasonable representation, and (2) prejudice, i.e., a reasonable probability that, but for counsel's errors, the proceeding's result would have been different." *State v. Madison*, 2020-Ohio-3735, ¶ 20, citing *Strickland v. Washington*, 466 U.S. 668, 687-688, 694 (1984).

**{¶36}** A party must establish prejudice by demonstrating that a reasonable probability exists that " 'but for counsel's errors, the result of the proceeding would have

been different. A reasonable probability is a probability sufficient to undermine the outcome.' " *Hinton v. Alabama,* 571 U.S. 263, 275 (2014), quoting *Strickland,* 466 U.S. at 694. "Failure to establish either element is fatal to the claim." *State v. Jones*, 2008-Ohio-968, ¶ 14 (4th Dist.). Therefore, if one element is dispositive, a court need not analyze both. *State v. Madrigal*, 87 Ohio St.3d 378, 389 (2000) (the failure to satisfy one of the ineffective-assistance-of-counsel elements "negates a court's need to consider the other").

{¶37} Even if father could establish that trial counsel performed deficiently in failing to request a continuance of the permanent custody hearing, father has not demonstrated a reasonable probability that the result of the proceeding would have been different. R.C. 2151.35(B)(1) requires that the permanent custody hearing be held within 90 days after the complaint was filed and any extension of this date cannot exceed 45 days:

> The dispositional hearing shall not be held more than ninety days after the date on which the complaint in the case was filed except that, for good cause shown, the court, on its own motion or on the motion of any party or the child's guardian ad litem, may continue the dispositional hearing for a reasonable period of time beyond the ninety-day deadline. This extension beyond the ninety-day deadline shall not exceed forty-five days and shall not be available for any case in which the complaint was dismissed and subsequently refiled.

{¶38} The complaint for permanent custody was filed May 15, 2024. Therefore, the disposition hearing was required, even with a 45-day extension, by September 27, 2024. Though the record does not reflect who requested the extension, in the judgment entry following the adjudication hearing in July 2024, the trial court granted an extension of the disposition hearing beyond the original 90-day statutory limit. The hearing was held on September 10, 2024. Had father's trial counsel requested a second continuance of the

disposition hearing on September 10, 2024, at most the juvenile court could have extended him 17 additional days to work towards reunification. Although father argues that he could have made progress if given six additional months, he presents no argument or evidence that he would have been able to make any significant progress towards reunification if given the brief extension provided for by statute.

**{¶39}** We overrule the second assignment of error.

## IV. CONCLUSION

**{¶40}** We conclude that the juvenile court's decision to terminate father's parental rights and award permanent custody to the Agency was not against the manifest weight of the evidence. We further find that father's trial counsel was not ineffective for failing to seek a continuance of the permanent custody hearing to allow father more time to work towards reunification. We overrule the assignments of error and affirm the juvenile court's judgment.

JUDGMENT AFFIRMED.

## **JUDGMENT ENTRY**

It is ordered that the JUDGMENT IS AFFIRMED and that appellant shall pay the costs.

The Court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this Court directing the Athens County Court of Common Pleas, Juvenile Division, to carry this judgment into execution.

Any stay previously granted by this Court is hereby terminated as of the date of this entry.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

Smith, P.J. & Wilkin, J.: Concur in Judgment and Opinion.


For the Court



BY: _____
     Michael D. Hess, Judge




### NOTICE TO COUNSEL

**Pursuant to Local Rule No. 14, this document constitutes a final judgment entry and the time period for further appeal commences from the date of filing with the clerk.**